

**NORTHERN DISTRICT OF TEXAS**
**ENTERED**
TAWANA C. MARSHALL, CLERK
THE DATE OF ENTRY IS
ON THE COURT'S DOCKET

**The following constitutes the order of the Court.**

Signed November 21, 2005

*[signature]*
United States Bankruptcy Judge

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| VENTURELINK HOLDINGS, INC., | § | CASE NO. 02-80906-BJH-11 |
| Debtor. | § | (Chapter 11) |
| | § | |
| BARRY HONEA, | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | ADVERSARY NO. 04-03637-HDH |
| | § | |
| VENTURELINK HOLDINGS, INC. | § | |
| Defendants. | § | |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

Came before the Court for trial, the Proof of Claim filed by Plaintiff, Barry Honea and the Objection to Mr. Honea's Proof of Claim. The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 1334 and 151, and the standing order of reference in this district. This Matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(B). The Court

makes the following findings of fact and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 7052:

## Findings of Fact

1. On or about April 25, 2003, Plaintiff filed an unsecured, nonpriority proof of claim (the "Proof of Claim") against PUSA in the amount of $1,334,446.00.

2. On September 1, 2004, the Official Committee of Unsecured Creditors and Debtors filed their *First Omnibus Objections to Claims Pursuant to Sections 105 and 502 of the Bankruptcy Code and Federal Rules of Bankruptcy Procedure 3001 and 3007* (the "Claim Objection").

3. On or about October 1, 2004, Plaintiff filed his *Response of Barry Honea to the Official Committee of Unsecured Creditors' and the Debtors' First Omnibus Objection to Claims*.

4. On November 8, 2004, this Court entered an order converting the allowance process for Claimant's Proof of Claim to this adversary proceeding.

5. Between April 16, 1997 and January 1, 2002, Honea was employed by PUSA and several subsidiaries of PUSA, including Pacific Technology Group, Inc. ("PTG"), Pacific Technology Services, Inc. ("PTS"), and Stonehouse Technologies, Inc. ("Stonehouse") as Chief Financial Officer ("CFO").

6. On September 13, 2000, Honea received an offer of employment from i2 Technologies, Inc. as Revenue Controller. The offer Honea received from i2 Technologies, Inc. included an equity incentive component comprised of stock options. Honea formally accepted the offer of employment on September 18, 2000.

7. On September 15, 2000, Honea sent a letter to John E. Gates, CEO of PTG, tendering his resignation from PTG and its subsidiaries, which was to be effective September 28, 2000.

8. On or about September 25, 2000, Honea was approached by Bradley, who asked him to stay with the PUSA companies. In order to induce Honea to stay with the PUSA companies, Bradley promised Honea that he would receive a substantial deferred compensation payment under a capital appreciation plan.

9. Honea requested to see the CAP II plan document in order to determine the structure of the compensation plan under which he would receive such a substantial payout.

10. Bradley instructed Honea to go to the law firm of Wolin, Ridley, and Miller to view the CAP II plan documents. Honea followed Bradley's instructions and went to the law firm, where he learned from Defendants' counsel, Julie Lennon ("Lennon"), that no CAP II plan document could be found.

11. Honea informed Bradley that the CAP II plan documents could not be found, and that he was unwilling to forego a potentially lucrative career opportunity at i2 Technologies, Inc. without a guaranteed payment.

12. While Bradley again assured Honea that the CAP II existed, he promised Honea that he would receive a minimum $1 million, net of tax liability.

13. On September 27, 2000, Honea, PUSA and PTG entered into an agreement outlining the basic terms of Honea's employment with PTG and Honea's compensation with both PTG and PUSA (the "Bradley Letter").

14. Lennon, PUSA's counsel, testified that she drafted the Bradley Letter.

15. The Bradley Letter contains provisions outlining Honea's "long-term compensation," including a provision stating that "The minimum payout due to you under the CAP II program shall be $1,000,000 net of tax liability."

16. The testimony of both Honea and Lennon established that the Bradley Letter was hastily drafted because Honea was scheduled to begin his new employment the following Monday. The Bradley Letter specifically acknowledged that it would be followed by more formal documentation . While the Bradley Letter encompassed all of the material terms of the parties' agreement, the agreement was not the final and complete agreement of the parties.

17. It is undisputed that at the time of the parties' agreement, Bradley was the CEO and director of both PUSA and PTG.

18. Bradley's testimony is also inconsistent with the testimony provided by Barry Honea, Lennon, and John Sloan ("Sloan"), all of whom testified that the ECA attached to Lennon's August 8, 2001 e-mail to Sloan, which sets forth Honea's entitlement to $1 million net of tax liability, reflects the final agreement of the parties.

19. Sloan's testimony established that Bradley told Sloan that he had promised Honea $1 million net of tax, and that such obligation was an obligation of PUSA.

20. Bradley's testimony that he had no involvement in the drafting of the formal documents reflecting the parties' agreement was directly contradicted by PUSA's counsel, Lennon, who testified that she worked first with Bradley and then Sloan throughout the drafting process. Lennon's testimony is corroborated by the voicemail she left for Honea on January 8, 2001, in which she told Honea "…then I can talk to Bill about the …CAP II, but you know we discussed that we'll put that inside your contract without having to finalize the CAP II.

21. It is undisputed that the CAP II program was intended to be an incentive program. If PUSA and its subsidiaries enjoyed an increase in value, Honea would have had the opportunity to earn more than $1 million net of tax. Any increase in value of PUSA and its subsidiaries became relevant to the agreement with Honea only to the extent the increase in value allowed Honea to earn more than $1 million net of tax, but Honea was entitled to a minimum of $1 million net of tax regardless of whether PUSA and its subsidiaries increased in value.

22. In exchange for and in reliance on Bradley's promise to Honea that Honea would receive a minimum $1 million net of tax payment, Honea revoked his acceptance of the job at i2 Technologies, Inc.

23. PUSA's representation to Honea that PUSA would pay Honea $1 million net of tax liability was made in order to induce Honea to revoke his acceptance of the i2 Technologies, Inc. job offer and continue his employment with the PUSA companies.

24. Per Bradley's direct instructions, Honea worked directly with PUSA's counsel, Lennon, to draft formal documents clarifying and formalizing the parties' agreement, as contemplated by the Bradley Letter.

25. Lennon, PUSA's counsel, testified that she drafted the first draft of the formal document, at that time called the "Executive Employment Agreement" ("EEA").

26. On the same day that Lennon sent the first draft of the formal document to Honea, October 27, 2000, Lennon called Honea and told him that the CAP had not been included, and verified that the obligation was a contractual obligation of PUSA. Every draft of the EEA and later the ECA prepared thereafter reflects a $1 million minimum net of tax obligation.

27. Subsequent to the October 27, 2000 draft, Honea proposed drafting changes to the formal document in order to better reflect the agreement with Bradley. Lennon, counsel for

PUSA, incorporated Honea's proposed drafting changes. Although Lennon worked with Bradley throughout the drafting process, Lennon never told Honea that any of his proposed drafting changes did not correspond to the parties' agreement, nor did she inform Barry Honea that any change had been rejected by her client or that she lacked the authority to make any of the changes.

28. Even without Honea's proposed drafting changes, the drafts of the EEA and later the ECA drafted by Lennon reflect Honea's entitlement to $1 million net of tax liability.

29. Honea testified that none of his markings or interlineations were intended to change the terms of the original agreement, but were solely drafting changes made to better reflect the parties' original deal.

30. Honea's clarification of the terms of the agreement in the formal document reflect his understanding that PUSA's obligation to pay him $1 million net of tax was a contractual obligation of PUSA not tied to an increase in value of the company, but was instead a *minimum* amount, to which he was entitled regardless of whether the CAP II was ever created or funded or whether the PUSA companies increased in value. However, Honea understood that pursuant to the terms of the CAP II, he would have the opportunity to earn more than $1 million net of tax if PUSA and its subsidiary companies enjoyed a substantial increase in value.

31. When the process of drafting the formal document(s) memorializing the parties' agreement took longer than Honea had expected, Honea expressed his concern to Lennon. Lennon told Honea that he was protected under the Bradley Letter, and the formal documents were merely meant to further clarify the agreement as reflected in the Bradley Letter.

32. Before any formal document was finalized, Bradley resigned from his position as Chief Executive Officer of PUSA. Upon Bradley's resignation, Sloan ("Sloan") succeeded Bradley at the helm of the PUSA companies.

33. When Honea learned of Bradley's intent to resign, he sent Bradley a letter requesting a meeting. Honea testified that the purpose of the letter was to discreetly obtain an audience with Bradley to discuss the parties' agreement that Honea would receive $1 million net of tax. In response to Honea's letter, Bradley met with Honea and assured him that he would make Sloan aware of the agreement and that Sloan would finalize and execute the formal document on behalf of PUSA. Bradley stated that he believed the agreement would be stronger if executed by the "go-forward" CEO.

34. Sloan met with Honea and informed him that Bradley had explained the parties' agreement to him. Sloan promised Honea that he would get the formal documents completed in a timely manner.

35. Sloan requested that certain non-material modifications be made to the agreement. First, in order to keep PUSA's obligation to pay Honea the minimum $1 million confidential, particularly with respect to John Todd, CEO of Stonehouse, Sloan requested that PUSA's $1 million net of tax obligation be memorialized in a separate document from Honea's formal employment agreement.

36. Second, because Honea was working primarily for Stonehouse at the time, Sloan requested that the employer identified in the formal employment agreement be identified as Stonehouse instead of PTG.

37. Finally, because Honea had been offered certain stock options from Stonehouse, Sloan wanted to include a clause in the PUSA compensation agreement providing that Honea

would receive a reduced payout from PUSA to the extent he received a payout under Stonehouse's stock option plan.

38. The Court may infer from this change requested by Sloan that PUSA desired that Honea receive $1 million net of tax without regard to the mechanism by which it was paid.

39. Honea agreed to the non-material modifications, and the terms of Honea's employment agreement and the $1 million obligation were split into two agreements, the Executive Employment Agreement and the Executive Compensation Agreement.

40. Although Defendants asserted that the EEA superseded the Bradley Letter and the ECA, Defendants failed to adduce sufficient evidence to prove that Honea received consideration for allegedly waiving his entitlement to $1 million net of tax.

41. On August 8, 2001, after the parties' had finalized the formal EEA and ECA, Lennon forwarded the documents in an e-mail to Sloan, on which she copied Honea, for execution.

42. John Todd, CEO of Stonehouse, and Barry Honea executed the EEA sometime after August 8, 2001, although both Todd and Honea "backdated" the signatures to August 1, 2001.

43. Within 2 days after Lennon forwarded the documents to Sloan, Sloan was removed from his position as CEO or acting CEO. Jack Takacs ("Takacs") was named CEO of PUSA.

44. After Sloan's departure, Honea called him to ask if he had signed the ECA. Sloan indicated that he had not, but advised Honea to show up "with his hand out" on December 31, 2003, the scheduled date of the first payout.

45. Sloan, Lennon, and Honea testified that the final expression of the parties' agreement is accurately memorialized in the ECA.

46. After becoming the CEO of PUSA, Takacs asked Honea to waive his rights to the $1 million minimum payment from PUSA. Honea refused to waive his claim without

consideration, but stated that he would be willing to discuss waiving his rights in exchange for a settlement payment or restructuring the deal. Although Takacs stated that he would meet with Honea again in order to discuss settling the obligation or restructuring the deal, Takacs never approached Honea to discuss a possible settlement or restructuring.

47. Takacs did not tell Barry Honea that the parties' had never entered into a valid agreement, or that Takacs did not believe PUSA was obligated to pay Barry Honea $1 million.

48. Takacs' request that Barry Honea waive his rights suggests that Takacs believed PUSA was obligated to pay Barry Honea $1 million net of tax liability.

49. Takacs' failure to repudiate the parties' agreement, orally or in writing, supports a finding that Takacs believed PUSA was obligated to pay Honea $1 million net of tax.

50. No representative of PUSA, including PUSA's outside counsel, Lennon, PUSA's general counsel, Paul Weber, PUSA's various CEOs, Bradley, Sloan, and Takacs, nor any member of PUSA's board of directors ever notified Honea that PUSA did not intend to honor the agreement or that PUSA did not believe that Honea and Bradley entered into a valid, binding agreement. No repudiation occurred even after Lennon, PUSA's outside counsel, sent the final draft of the ECA to PUSA's then-CEO, Sloan.

51. PUSA's total failure to repudiate or disavow the agreement supports a finding that PUSA believed it was obligated to pay Barry Honea $1 million net of tax.

52. In approximately March of 2002, Barry Honea was elected Chief Financial Officer ("CFO") of PUSA at a board meeting. At that time, Honea learned that he had been elected Chief Administrative Officer of PUSA without his knowledge or consent in January of 2002.

53. On or about April 1, 2002, Honea resigned his title as CFO of PUSA, but continued his employment with PUSA as a non-executive.

54. On May 17, 2002, Honea submitted his final resignation from PUSA, PTG, PTS, Stonehouse, and other subsidiaries of PUSA.

55. Honea never received any payment from PUSA pursuant to the agreement.

56. On April 25, 2003, Honea filed an unsecured, nonpriority proof of claim against PUSA in the amount of $1,334,446. Plaintiff testified that he arrived at the amount of $1,334,446 by determining 80% of $1 million net of tax using the marginal tax rate applicable at the time he filed his proof of claim.

**57.** Honea's claim is determined to be 80% vested and the amount of his damages should be modified to $1,257,736, using the applicable tax rates for the years 2003, 2004, and 2005, the years in which the $1 million net of tax obligation was to be paid pursuant to the payout schedule.

## Conclusions of Law

1. Honea and PUSA entered into a valid, binding agreement on or about September 27, 2000, whereby PUSA agreed to pay Honea $1 million net of tax liability in exchange for Honea's revocation of his acceptance of another job offer and continuation of his employment with the PUSA companies.

2. Sections 501 and 502 of the Bankruptcy Code and Bankruptcy Rule 3001 provide that "a party correctly filing a proof of claim is deemed to have established a prima facie case against the debtor's assets." *In re Fidelity Holding Co., Ltd.*, 837 F.2d 696, 698 (5th Cir. 1988). The claimant will prevail unless a party who objects to the proof of claim produces evidence to rebut the claim. *Id*.

3. Upon production of this rebuttal evidence, the burden shifts to the claimant to prove its claim by a preponderance of the evidence. *Id*. However, the ultimate burden of proof lies with the party who would bear the burden if the dispute arose outside of the bankruptcy context. *Raleigh v. Illinois Dep't of Revenue,* 530 U.S. 15, 120 S.Ct. 1951, 147 L.Ed.2d 13 (2000).

4. Plaintiff met his burden of proving that he gave consideration to PUSA in exchange for the $1 million net of tax obligation in the form of revocation of his acceptance of another job offer, withdrawal of his resignation, and continuation of his employment with the PUSA companies.

5. The Bradley Letter is an incomplete expression of the parties' agreement. The Bradley Letter is akin to a letter of intent – while it is binding and sets forth the material terms of the parties' agreement, it was never intended to be the final expression of every detail of the parties' agreement.

6. PTG, a wholly-owned subsidiary with the same chief executive officer and directors as its parent company, PUSA, acting through its shared CEO, Bradley, had the capacity to bind PUSA to an obligation to provide benefits to an employee of PTG. The evidence presented at trial showed that PTG never had funds, operations, benefits plans, a capital appreciation plan, or any other type of deferred compensation plan. Lennon testified that Bradley had previously offered participation in PUSA's CAP I plan to employees of PUSA subsidiaries.

7. The final expression of the parties' agreement is accurately memorialized in the ECA.

8. That the ECA was not signed by PUSA does not relieve PUSA of its obligation thereunder. The ECA was intended by the parties to be a clarification of the parties' agreement as reflected in the Bradley Letter, signed by both parties. The parties had already agreed to the material terms of the agreement, and such agreement was valid and binding. The failure of PUSA to sign the finalized document, prepared by its own counsel, does not vitiate the already-binding agreement. *In re Bunzl USA, Inc.*, 155 S.W.3d 202, 209-210 (Tex.App.—El Paso, 2004, mandamus denied), *Mechanical Wholesale, Inc. v. Universal-Rundle Corp.*, 432 F.2d 228, 230 (5th Cir. 1970) (holding that where the parties intend their agreement to be effective from the time when it is made, it will be given effect from that time though they agree or intend that a formal writing embodying its provisions shall subsequently be signed).

9. Sloan had the actual authority to finalize and execute the ECA. Despite Sloan's conclusory testimony that he did not have the authority to execute the finalized ECA, Defendants did not dispute that Bradley expressly delegated the authority to finalize the document to Sloan.

10. Even if Sloan did not have the actual authority to finalize or execute the ECA, it is undisputed that Sloan possessed apparent, inherent, or implied authority. Sloan admitted that he could see no reason why Honea would not have believed he was CEO. PUSA's own counsel,

Lennon, testified that Sloan was CEO after Bradley's resignation. Lennon further testified that she worked directly with Sloan to finalize the formal documents reflecting the parties' agreement. Finally, PUSA's Chief Administrative Officer identified Sloan as PUSA's CEO in a memorandum sent to all of PUSA's subsidiary employees.

11. Lennon, attorney for PUSA, acted on behalf of her client in her dealings with Honea per Bradley's instructions. Lennon testified that she maintained contact first with Bradley and later Sloan throughout the drafting process. Defendants produced no evidence to indicate that Lennon acted without authorization from her client, or that she acted beyond the scope of her authority.

12. Honea performed his obligations under the parties' agreement by revoking his acceptance of the i2 Technologies, Inc. offer, withdrawing his resignation, and continuing his employment with PUSA's subsidiary, PTG.

13. Even if Honea and PUSA did not enter into a valid, binding agreement on or about September 27, 2000, PUSA ratified the agreement sometime thereafter. PUSA acted in a manner inconsistent with the intention of avoiding the prior agreement and did so with the knowledge of all material facts of the original agreement as set forth in the Bradley Letter and the ECA. Old Republic Ins. Co., Inc. v. Fuller, 919 S.W.2d 726, 728, 729 (Tex.App.—Texarkana 1996, writ denied) (setting forth elements of ratification), McMahan v. Greenwood, 108 S.W.3d 467, 480-81 (Tex.App.—Houston [14th Dist.] 2003, pet. denied) (knowledge acquired by an attorney during the existence of an attorney-client relationship, and while acting in the scope of his or her authority, is imputed to the client), Poth v. Small, Craig & Werkenthin, L.L.P., 967 S.W.2d 511, 515 (Tex.App.—Austin 1998, pet. denied), citing American Centennial Ins. Co. v. Canal Ins. Co., 810 S.W.2d 246, 256 (Tex.App.—Houston [1st Dist.] 1991), aff'd in part & rev'd in part on

*other grounds*, 843 S.W.2d 480 (Tex. 1992) (an attorney's knowledge may be imputed to the client).

14. By accepting the benefits of Plaintiff's performance of the agreement in silence, PUSA acted in a manner inconsistent with an intention to avoid the contract. *Land Title Co. of Dallas, Inc. v. Stigler, Inc.*, 609 S.W.2d 754, 756-57 (Tex. 1980), *Barker v. Roelke*, 105 S.W.3d 75 (Tex.App.—Eastland 2003, pet. denied), *Oberholtzer v. Myles*, 147 S.W.2d 569, 574 (Tex.Civ.App.—Amarillo 1941, writ dism'd judgmt. cor.) (finding that by receiving the benefits of the transaction and by not repudiating the transaction, the principal ratified the agreement).

15. From September 27, 2000 to May 31, 2002, Honea continued his employment with the PUSA companies pursuant to the agreement. During that time, no representative of PUSA, including PUSA's outside counsel, Lennon, PUSA's general counsel, Paul Weber, PUSA's various CEOs, Bradley, Sloan, and Takacs, nor any member of PUSA's board of directors ever notified Barry Honea that PUSA did not intend to honor the agreement or that PUSA did not believe that Barry Honea and Bradley entered into a valid, binding agreement whereby PUSA was obligated to pay Honea a minimum of $1 million net of tax in exchange for his revocation of another offer and continued employment at the PUSA companies. No repudiation was made even after Lennon, PUSA's outside counsel, sent the final draft of the Executive Compensation Agreement to PUSA's then-CEO, Sloan.

16. Jack Takacs, PUSA's CEO from August 2001 until sometime in 2004, recognized PUSA's obligation to pay Honea $1 million net of tax when he requested that Plaintiff waive his rights to the $1 million obligation sometime in the fall of 2001.

17. Even after Honea refused to waive his entitlement to $1 million net of tax without consideration, no representative of PUSA ever repudiated the agreement.

18.     PUSA breached its agreement with Honea by failing to pay Honea $1 million net of tax liability.

19.     Defendants failed to plead the statute of frauds and the defense is therefore waived. FED. R. CIV. P. 8(c), *Automated Medical Laboratories, Inc. v. Armour Pharmaceutical Co*., 629 F.2d 1118, 1123 (5th Cir. 1980).

20.     Even if Defendants' assertion of the statute of frauds is not waived, the statute of frauds does not prevent the finding of a valid, binding agreement. The statute of frauds is satisfied because the parties signed a written memorandum, the Bradley Letter, furnishing evidence of the contract and its essential terms. *Key v. Pierce*, 8 S.W.3d 704, 708 (Tex.App.—Ft. Worth 1999, pet. denied). *See also Joiner v. Elrod*, 716 S.W.2d 606, 609 (Tex.App.—Corpus Christi, 1986, no writ) (the memorandum may be in any writing, formal or informal, and need not contain every stipulation to which the parties have agreed).

21.     The statute of frauds is further inapplicable because an unsigned document modifying a written contract may be enforced despite the statute of frauds if the modification is not material. *Garcia v. Karam*, 276 S.W.2d 255, 257 (Tex. 1955), Kerrville HRH Inc. v. City of Kerrville, 803 S.W.2d 377, 389 (Tex.App.—San Antonio 1990, writ denied) (statute of frauds satisfied where the later modification, found in an unexecuted agreement, merely filled in details concerning which the original contract was silent).

22.     Finally, the statute of frauds is inapplicable because Plaintiff performed under the parties' agreement. *Carmack v. Beltway Dev. Co.,* 701 S.W.2d 37, 40 (Tex.App.—Dallas 1985, no writ)

23.     The Court finds that the EEA between Stonehouse and Honea is not the final agreement between PUSA and Honea. A merger occurs if the same parties to an earlier

agreement later enter into a written integrated agreement covering the same subject matter. *Texas A & M University-Kingsville v. Lawson*, 127 S.W.3d 866, 872 (Tex.App.—Austin 2004, pet. denied). The doctrine applies only where there is complete identity of the parties and subject matter between the contract being interpreted and the contract being proffered. *Carr v. Weiss*, 984 S.W.2d 753, 765 (Tex.App.—Amarillo 1999, pet. denied).

24. Defendants failed to establish, or even assert, that the parties to the EEA and ECA were identical. The EEA is an agreement between Stonehouse and Honea. The ECA is between PUSA and Honea. Further, Defendants failed to assert or establish that the EEA and the ECA covered the same subject matter. The EEA addressed the terms of Honea's employment with Stonehouse. The ECA addressed Honea's entitlement to $1 million net of tax in deferred compensation from PUSA. Finally, the $1 million deferred compensation agreement is of the type that might naturally be made as a separate agreement from the terms of Plaintiff's employment with a separate entity. *See Smith v. Smith*, 794 S.W.2d 823, 828 (Tex.App.—Dallas 1990, no writ).

25. Honea's testimony was credible. Bradley's testimony which contradicted Honea's testimony that he had an enforceable agreement was not persuasive, and is also inconsistent with the testimony provided by Lennon and Sloan. Honea carried his burden of proof.

26. The Court finds that Honea's claim is 80% vested, and the amount of his damages are therefore $1,257,736, using the applicable tax rates for the years 2003, 2004, and 2005, the years in which the $1 million net of tax obligation was to be paid pursuant to the payout schedule.

###End of Findings of Fact and Conclusions of Law###